## EISENHAUER v. DE BELAUNZARAN and others.[1]

*(District Court, S. D. New York.   March 10, 1886.)*

CHARTER-PARTY — CESSER OF LIABILITY CLAUSE — RECHARTER — DEPARTURE — PROVISIONAL SETTLEMENT—DIFFERENCE OF FREIGHT — NOTE — VOLUNTARY PAYMENT—DISCHARGE.

Respondents chartered the bark F. for a voyage from New York to Spain, and thence to Brazil.   The charter-party provided: "Any difference in freight to be settled before the vessel's departure from port of loading; if in charterer's favor, by captain's draft upon his consignees, payable 10 days after arrival of vessel at port of discharge.   Charterer's responsibility for amount of outward charter to cease when vessel is loaded with outward cargo, and bills of lading are signed for same.   If required by charterers, captain to sign recharter without prejudice to this charter."   At Cadiz, the captain, under the above provision, executed a recharter of the vessel to F. & Co. to carry salt to Santos, Brazil, at 22 shillings per ton delivered, and the difference of freight being in charterer's favor, the captain gave a note to the Cassa Marittima for the difference, payable absolutely 15 days after his arrival, at Santos, with a pledge of the ship and freight for payment.   On such arrival the cargo was found to be short, and the freight on the amount delivered, after paying the note in full, not being equal to the balance of charter money due, the captain brought this action against the original charterers for the amount, which is equal to the freight on the shortage of cargo.   *Held,* (1) that the cesser of liability clause in the charter applied to the voyage from New York to Spain, but did not apply to the voyage from Cadiz to Santos, and that a similar clause in the recharter was not available to the respondents.   *Held,* (2) that the settlement, and the draft given in pursuance of it, as contemplated by that clause of the charter, when the true amount of freight was dependent upon the amount of cargo delivered, were not absolute and final, but provisional only, and subject to correction and deduction, for any just cause by which the amount of freight at port of discharge might become less than what had been estimated in the settlement, through no fault of the ship; and this, whether the right to such deduction were expressed in the draft or not; that the master was bound to deduct, from the estimated settlement and from the note, before payment, any sum found not justly applicable thereto; and that the master's receipt of sufficient freight moneys, applicable to the payment of the original charter money, inured as a payment thereof, and discharged the charterers.   *Held,* (3) that the making by the master of a note to the Cassa Marittima for an absolute payment, with a pledge of the ship and freight, without being required to do so by the charter or the recharter, and without providing for a possible reduction of freight, was a departure from the original charter, and his payment of the note out of freight money received was a voluntary and wrongful payment, which discharged the original charterers from liability for the balance of the charter money.

Action for Charter Money.
*Wilcox, Adams & Macklin,* for libelant.
*Olin, Rives & Montgomery,* for respondents.

BROWN, J.   The libel in this case was filed to recover the sum of $576.29, the balance of charter money alleged to be due from the respondents, as charterers of the British bark M. J. Foley, under a charter-party executed between the respondents and the master, at the city of New York, on the eleventh day of October, 1884, for a voyage to Spain, and thence to Brazil, for the round sum of £878;

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

£400 payable on delivery of "outward cargo," and the balance on the "delivery of the Brazil cargo at the final port of discharge." The installment for the outward voyage to Cadiz was paid, and a recharter was there executed by the captain to Florez & Co., dated December 29, 1884, under the provisions of the original charter, which provided that the captain, if required by charterers, should sign a recharter, "without prejudice to this charter." Under the recharter the vessel was loaded at Cadiz for Santos, Brazil, with 606 tons of salt, as supposed, the freight to be at the rate of "22 shillings per English ton delivered." Before sailing from Cadiz, upon a "provisional settlement" between the master and Florez & Co. in respect to the freight for the Brazil voyage, after deducting from the estimated freight money some $300 advanced by Florez & Co. to the master in cash, and the sum of £478, the unpaid installment of the original charter money, there remained a balance of £264 7s. 5d. of the estimated freight as per recharter, for which balance the captain gave Florez & Co. his note, payable to the order of the Cassa Marittima, of Genoa, 15 days after his arrival at Santos, with an hypothecation of the vessel and freight as security.

On the discharge of the cargo at Santos, the weight reported by the custom-house weigher was 543 tons only, and the master collected from the consignees of the cargo freight upon 543 tons only. The delivery not having been completed within 15 days after arrival at Santos, the note was paid in full before the weight of the cargo discharged was known. The shortage of 63 tons, which appeared after payment of the note, consequently left the master in arrears, for the balance of the charter money, to an amount equal to 22 shillings per ton upon the shortage, for which deficiency this libel is filed against the original charterers.

The case turns, in part, upon the construction of the special provisions of the charter, and in part upon the question of diligence or negligence of the master at Santos. The charter contains the following clauses:

"The bills of lading to be signed, as presented, without prejudice to this charter. Any difference in freight to be settled before the vessel's departure from port of loading; if in vessel's favor, in cash at the current rate of exchange, less insurance; if in charterers' favor, by captain's draft upon his consignees, payable ten days after arrival of vessel at port of discharge. Charterers' responsibility for amount of *outward charter* to cease when vessel is loaded with *outward cargo*, and bills of lading are signed for the same. Vessel to have an absolute lien upon the cargo for all freight and demurrage. If required by charterers, captain to sign recharter, without prejudice to this charter."

The respondents claim that the clause providing for a cessor of liability on the part of the charterers should be applied to the voyage from Cadiz to Brazil, as well as to the voyage from New York to Cadiz; both because the charterers, by reason of their absence from Santos, are within the general reason for inserting this provision, and

also because the voyage from Cadiz to Santos was a part of one entire "outward voyage" from New York to Santos.

The cesser of liability clause, as it is called, is now common in charter-parties, and has been often presented for adjudication in the English courts. Its general object is to free the charterer from responsibility at distant ports, arising from circumstances not within his control, or subject to his supervision. It is usually associated, as in this case, with an absolute lien upon the cargo in favor of the ship for her freight and demurrage; and the general construction of the two clauses together is to consider the intent of the parties to be that the ship shall look to her lien on the cargo for all her claims arising after she leaves the port of loading, instead of relying on the personal responsibility of the charterer; and if the language exempting the charterer from the time the vessel sails is clear and explicit, he will be protected even against claims for prior delays at the place of loading, as well as for claims at the place of discharge, though he were his own consignee. *Sanguinetti* v. *Pacific Steam Nav. Co.*, 2 Q. B. Div. 238–247; *French* v. *Gerber*, 1 C. P. Div. 737, (affirmed, 2 C. P. Div. 247;) *Bannister* v. *Breslauer*, L. R. 2 C. P. 497; *Francesco* v. *Massey*, L. R. 8 Exch. 101; *Kish* v. *Cory*, L. R. 10 Q. B. 553; *Gardner* v. *Frechmann*, 15 Q. B. Div. 154.

Exemptions of this kind, however, are not to be extended beyond the fair import of the language of the charter. *Boult* v. *Naval Reserve*, 5 Fed. Rep. 209. In that case, which in many respects resembles this, but in which no draft had been given to the shippers, and the freight was made payable per ton on weight delivered, it was held by MORRIS, J., that the shippers could not collect the excess as estimated upon shipment, but must bear the loss of freight arising from a shortage happening through no fault of the ship, notwithstanding the further stipulation that the charterers would not be held liable for loss of freight arising from any cause beyond their control.

In the present case it is not necessary to determine what would have been the effect of the cesser of liability clause had it applied, under the original charter, to the voyage from Cadiz to Santos, inasmuch as the fair construction of the charter does not, in my judgment, admit of the application of the cesser clause to the latter voyage. The printed form of charter used was one designed for an outward and a *homeward* voyage. Wherever the word "homeward" was used in the printed form of this charter, the words "Brazil" or "to Brazil" are inserted. The charter thus contemplates a voyage in two parts: *First*, to Cadiz; and, *second*, from Cadiz to Brazil. The cesser clause is in print, and the printed form does not cover the *homeward* voyage; nor is anything inserted in this clause as to the "Brazil voyage," or the "Brazil cargo," although these are several times referred to in the charter by that form of expression. On the contrary, the cesser clause in the printed form is limited to the "amount of outward charter;" that is, to the installment payable for the voy-

age from New York to Cadiz. The reason for not having a similar provision for the homeward cargo in the printed form was doubtless because no such provision was necessary where the final discharge was to be in the charterers' own port, since they could there look after their own interests. The second part of the voyage, however, in this case being to Brazil, where the charter was to terminate, there might be, no doubt, similar reasons for inserting the cesser clause as respects that part of the whole voyage; but, in using the blank form designed for homeward voyages, there was no provision for other than the outward voyage, and the parties have not supplied the omission by inserting any other similar provision for the Brazil voyage. The court cannot supply it for them. It would be going beyond the limits of fair construction to interpret the word "outward" in the cesser clause in any different sense from that in which it is used in all the other parts of the charter; and in every other place, as I have said, it is used in distinction from the "Brazil voyage" or the "Brazil cargo." I cannot hold the respondents discharged, therefore, by virtue of the cesser clause in the original charter.

2. In the recharter executed by the master to Florez & Co. at Cadiz, a similar provision is inserted: "Charterers' liability to cease on cargo being shipped and advances made." But the respondents are not the charterers under that charter. They were not members of the firm of Florez & Co., nor pecuniarily interested in that firm. The terms upon which the respondents transferred their rights under the charter to Florez & Co. do not appear, and are not material. Florez & Co. having acquired the right to freight the ship from Cadiz to Santos, they provided, by the recharter, for the carriage of a cargo of salt, at the rate of 22 shillings per English ton of 2,240 pounds delivered. Florez & Co., as charterers under the recharter, did not bind themselves to the payment of the original charter money; and the recharter must be assumed to be just what the original charterers framed and required the master to sign. The cesser of liability in the recharter is not available to the original charterers.

3. The original charter, however, did further provide as follows: "Any difference in freight to be settled before the vessel's departure from port of loading; if in charterers' favor, by the captain's draft upon his consignees, payable ten days after arrival of vessel at port of discharge." This clause is as applicable to the second part of the voyage as to the first. There is nothing in its language to limit it to the outward voyage. Upon the recharter, therefore, I think the captain might have been required to make such a provisional settlement at Cadiz, and to execute such a draft, as the original charter required. The recharter, however, did not contain any express clause to that effect, and I have great doubt, therefore, whether Florez & Co. had any right to such a settlement in advance. If they had not, the captain's note was given voluntarily, and at his own risk, and could not prejudice the respondents' right to have the freight collected applied, first, to the

payment of the balance of the charter money. But assuming that this provision of the original charter became applicable to the recharter, then, upon the settlement made at Cadiz, if, as respects the outward cargo from that port, a draft had been given in pursuance of and strictly according to the terms of the original charter, the case would present the question whether the settlement made at Cadiz should be deemed a final one as respects the recharterer, and the draft given under it payable absolutely and at all events; or whether the settlement should be held provisional only, and the amount of the draft be held subject to deduction for such just causes as might appear at the port of discharge. For, if the original charter bound the master to pay absolutely the draft given at the port of loading under the recharter that the original charterers required him to execute, then it is clear that the original charterers took the risk of any final deficiency in payment of the charter money out of the freights earned, after paying the draft, if this deficiency arose without the fault of the vessel.

I have not found any case in which the nature of the "settlement" of the freight at the port of loading, under a clause like this, has been referred to, save in that of *The Naval Reserve*, 5 Fed. Rep. 209, above cited. But there had been no recharter in that case; nor was any "settlement" in that case stipulated for; nor had any draft been given, although the original charter provided for the execution of a draft for the difference. The suit was brought by the shippers upon the original estimate of freight; and it was held that they could not recover.

The intent of this clause must be gathered, not from its language alone, but in view of the circumstances likely to arise, and within the presumed contemplation of the parties. In the first place, the master had no means of knowing the exact weight of cargo taken aboard. The bill of lading states, "Weight and quality unknown." The cargo was loaded, and required to be loaded, by the charterers' stevedore; and the draft was made, not upon the final adjustment of the freight, but upon a "provisional settlement," and "estimated" freight. There are, moreover, the ordinary contingencies of such voyages. The cargo might be lost or jettisoned, in whole or in part, or damaged, so that the estimated freight would not be recoverable. There might be mistake, or even fraud, in the recharterers as respects the weight put aboard; or a loss of weight upon the voyage through natural causes. It is scarcely credible that it should be the intention of a clause like this to cast upon the ship the liability for all these contingencies, and thus to make her, in effect, an absolute insurer of the collection of the exact estimated amount of freight represented by the draft. Moreover, there is nothing in the charter that requires any acceptance of the draft by the consignees before payment. The time given after arrival is presumptively for the purpose of enabling the master to collect sufficient freight money before payment, and to ascertain what corrections, if any, are to be made upon the estimated freight repre-

sented by the draft. In this case, the exact amount of freight could not possibly be ascertained until discharge, because the amount of freight was made dependent upon the amount of cargo *delivered*. It would seem very improbable, if not absurd, therefore, to suppose that the settlement stipulated for at the port of loading, as respects a cargo thus freighted, was intended to be a final settlement; or anything more than a "provisional settlement" upon a mere "estimate" of the amount of freight. In this case, the parties themselves have, in their own account, described the settlement as one of that character. The construction which the parties, in this instance, have put upon this clause, in terming it a "provisional settlement" upon "estimated" freight, is, I am satisfied, the proper and the legal one. If, in any case, the settlement stipulated for could be held intended to be a *final* settlement, it could only be where the amount of freight itself is definitely fixed by the charter or bill of lading; and not, as in this case, where the freight is made dependent upon the weight of cargo delivered.

I must hold, therefore, that any draft given pursuant to such a settlement upon a charter in which the true amount of freight is dependent upon the amount of cargo delivered, is subject to correction and deduction, for any just cause, by which the amount of freight recoverable at the port of discharge becomes, through no fault of the ship, less than that estimated in the settlement; and that in any such draft the master may properly have inserted a provision for a deduction accordingly. If no clause providing for such a reduction is contained in the draft, inasmuch as such a draft, payable only upon the contingency of the vessel's arrival, is not a negotiable instrument so as to give the holder any greater rights than the promisee, it would be equally subject to the same deductions as if that right had been expressed in it. As the captain, therefore, would have the right to make such deduction, it would be his duty to ascertain the true amount payable before paying such a draft, and to provide, first, for the full claims of the ship under his charter; because the amount applicable upon the draft would be only such as remained after the ship's charter money was paid. The master having the money derivable from the freight under his control, by means of his lien upon the cargo, and being bound to apply that money first to the ship's own charges upon it for the original charter money, his payment of the draft in full, without first protecting the ship's prior claims and the charterers' right to the appropriation of the freight earned to the discharge of the charter money, would be a payment in his own wrong, which would relieve the charterers from liability *pro tanto*. The captain's receipt of the freight money, sufficient to pay the charter money, would operate as a payment and discharge of the charterers' obligation, excepting so far as the master might have legally created superior liens upon the freight under the exigencies recognized by the maritime law.

In the present case it appears, as above stated, that, though a set-

tlement and draft were required to be given at the port of loading by the original charter, they were not required by any clausé in the recharter. So far as appears from the evidence, therefore, the acts of the captain in making the "provisional settlement," and in giving a note for the benefit of Florez & Co., the recharterers, were voluntary on his part, and unauthorized by the respondents, ·the original charterers. Though the latter might, under the original charter, have required the master to make such a settlement, and give a draft upon the recharter, they did not do so. For this reason, also, it would seem to have been done wholly at the vessel's risk.

Again, the note given by the master to Florez & Co. was a wholly different instrument from that contemplated by the original charter. It was, in effect, a promissory note executed by the master to the Cassa Marittima, providing for the absolute payment to the bank of £264 7s. 5d., "value received on above freight for my last necessary expenses in order to undertake a voyage from Cadiz to Santos, subject to the rules of Cassa Marittima, copy of which I had, and by terms of it I have pledged my vessel and freight, giving the same precedence over every other credit whatever." In truth, less than one-quarter of this sum was advanced to the master, even if that much was for "last necessary expenses." Upon the master's executing this note and pledge to the Cassa Marittima at Florez & Co.'s request, the latter executed to the captain the following agreement:

"For the amount of cash advanced to defray port charges and difference of freight resulting from the rechartering of the ship,—in all, £264 7s. 5d.,—the captain has given a guaranty or draft in the annexed form; *Messrs. Florez & Co hereby exempting* the captain and owners from all extra responsibilities, if any, arising therefrom, and other [than those] to which the ship is bound by the terms and conditions of the C. P. dated New York, eleventh October, 1884."

From this agreement it is evident, not only that the note given to the Cassa Marittima was a wholly different obligation from that contemplated by the original charter, but that both Florez & Co. and the captain understood that fact; and that the captain received the contract of Florez & Co., agreeing to exempt, and probably to indemnify, him from all this extra responsibility. If that was not the meaning of the agreement last cited, the only other meaning·that I can attach to it is that the master should not be required to pay the note according to its terms, but only according to the original responsibilities and rights existing under the original charter. In either case it seems clear that the payment of the note in full, and the diversion thereby of a part of the freight earned, from the payment of the first charge upon it, namely, the payment of the balance of the charter money, was a voluntary, wrongful, and negligent payment by the master, which operates as a discharge *pro tanto* of the original charterers; or it might be treated as a ground of legal recoupment by the respondents, to the extent of their liability, by reason of the master's wrong-

ful conduct. Macl. Shipp. 484; Abb. Shipp. 414–420; 1 Maude & P. 387; *Holdsworth* v. *De Belaunzaran*, 34 Hun, 382.

Upon these views of the case it become unnecessary to examine the further question whether the ship was not also negligent at Santos, as respects the actual amount of salt delivered. The great weight of proof would seem to show that 606 tons were put on board at Cadiz, and that there were no causes of any considerable loss in operation during the short and pleasant voyage to Santos. There are various circumstances that point to the probability that the deficiency of 63 tons was owing to some mistake or fraud at Santos, rather than at Cadiz. It was the duty of the ship to the original charterers—most especially in view of the note for the difference which the captain had executed—to observe diligently the weight of the cargo discharged. Upon that branch of the case, however, the testimony is embarrassing; and, as the views previously expressed are sufficient, in my judgment, to prevent recovery, I do not consider further the question in relation to the actual amount discharged at Cadiz.

The libel is dismissed, with costs.